John P. Aldrich (6877)
Catherine Hernandez (8410)
**ALDRICH LAW FIRM, LTD.**
7866 West Sahara Avenue
Las Vegas, NV 89117
jaldrich@johnaldrichlawfirm.com
chernandez@johnaldrichlawfirm.com

*Attorneys for Plaintiff*

[Additional counsel appear on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| JOSHUA LIEBLING, Derivatively on Behalf of Nominal Defendant LOOP INDUSTRIES, INC., ) ) ) | |
| Plaintiff, ) | Case No. _____ |
| v. ) | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| DANIEL SOLOMITA, DONALD DANKS, LOUISE SAMS, LAURENCE SELLYN, JAY STUBINA, ANDREW LAPHAM, JONGHYUK LEE, PETER KEZIOS, SIDNEY HORN, SHAUN HIGGINS, LESLIE MURPHY, and BRIAN YOUNG ) ) ) ) ) ) ) | **DEMAND FOR JURY TRIAL** |
| Defendants, ) | |
| and ) | |
| LOOP INDUSTRIES, INC., ) | |
| Nominal Defendant. ) | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Joshua Liebling ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Loop Industries, Inc. ("Loop" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Loop, legal filings, news reports, securities analysts' reports about the Company, the civil action *Securities and Exchange Commission v. Stephens et al.,* Case No. 3:22-cv-01483-KAW (S.D. Cal.), the criminal case *USA v. Stephens et al.,* Case No. 3:22-cr-02701 (S.D. Cal.), and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of Loop against certain of its officers and current and former members of the Company's Board for breaches of their fiduciary duties and violations of the federal securities laws between at least June 29, 2015 and November 22, 2022, inclusive (the "Relevant Period"), as set forth below.

2. Loop is a plastics recycling company headquartered in Terrebonne, Quebec, Canada and incorporated in Nevada. The Company went public via reverse merger with First American Group, Inc. ("First American"), a publicly traded shell corporation, on June 29, 2015 ("the Merger").

3. Prior to the Relevant Period, First American was acquired by David Stephens ("Stephens"). Stephens then worked alongside Daniel Solomita ("Solomita"), President, Chief Executive Officer ("CEO"), and Chairman of the Board of Loop, Donald Danks ("Danks"), a former member of the Board of Loop, and Jonathan Destler ("Destler"), a close business associate of Danks, to effectuate the Merger between First American and Loop.

4. As a result of the Merger, Stephens became the owner of all of the outstanding unrestricted shares of Loop; however, this was withheld from investors and the public. Stephens, working with Danks and Destler, concealed the extent of his ownership and control over the Company through the use of offshore and domestic nominee accounts.

5. Between 2015 and 2017, Stephens covertly transferred stock to Danks and Destler.

6. Danks, Destler, and Stephens then perpetrated a fraudulent and illegal scheme involving, *inter alia*, (i) concealing their ownership and control of Loop and its stock; (ii) manipulating the market for Loop stock to artificially inflate its price with the help of Robert Lazerus ("Lazerus"), a business associate of Danks and Destler; (iii) leaking material insider information to certain investors; and (iv) offloading their shares of Loop stock, in public markets and in private sales, to investors wholly unaware that they were purchasing shares from individuals who owned and controlled the Company and its stock (the "pump-and-dump scheme").

7. Throughout the Relevant Period, Loop management advanced the pump-and-dump scheme by causing the Company purposefully, recklessly, or negligently to conceal material facts with respect to the ownership and control of Loop and its stock.

8. On September 30, 2022, the SEC filed a civil complaint in this District against Danks, Destler, Stephens, and Lazerus alleging violations of antifraud provisions of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act") (the "SEC Action"). Solomita was named as a relief defendant in the SEC Action.

9. As a result of the SEC Action, the price of Loop stock fell dramatically, closing at $3.89 on October 3, 2022, an almost 14% decline from the stock's opening price of $4.51 on September 30, 2022, just one trading day earlier.

10. On November 22, 2022, the United States filed a grand jury indictment in this District against Danks, Destler, Stephens, and Lazerus for securities fraud and money laundering in connection with the pump-and-dump scheme (the "Indictment").

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act over the claims asserted herein for violations of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

15.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §§ 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District. Furthermore, the SEC Action and the Indictment were filed in this District.

**PARTIES**

*Plaintiff*

16.     Plaintiff is, and has been at all relevant times, a shareholder of Loop.

*Nominal Defendant*

17.     Nominal Defendant Loop is a plastics recycling company headquartered in Terrebonne, Quebec, Canada and incorporated in Nevada that purports to have developed an innovative proprietary technology that breaks down plastic in a more cost-effective way than its competitors. Since November 20, 2017, Loop stock has traded on the Nasdaq Global Market ("NASDAQ") under the symbol LOOP. Prior to that, from November 2015 until November 19, 2017, Loop stock traded on OTC Link, operated by OTC Markets Group, Inc., under the symbol LLPP.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

4

*The Individual Defendants*

18.     Defendant Daniel Solomita ("Solomita") has served as President, CEO, and Chairman of the Board of the Company since 2015. Defendant Solomita is also a founder of the Company. Having received proceeds from the illegal pump-and-dump scheme described herein, Solomita was named as a relief defendant in the SEC Action. According to the Company's public filings, Defendant Solomita received $5,699,500 during the fiscal year ending February 28, 2017 in compensation from the Company.

19.     Defendant Donald Danks ("Danks") is a founder of the Company, and he served as a member of the Board between 2015 and 2018. Defendant Danks was named as a Defendant in the SEC Action which alleged that Danks and others participated in a scheme involving, *inter alia*, manipulating the market for Loop stock, concealing their ownership and control of Loop to evade legal and regulatory requirements and fraudulently sell Loop shares, and leaking material non-public information to certain investors. Defendant Danks was also criminally charged in the Indictment for his alleged involvement in the pump-and-dump scheme and additionally for laundering some of the proceeds of that scheme. Defendant Danks serves as a Managing Partner of Touchstone Advisors, Inc. ("Touchstone") alongside Jonathan Destler. Defendant Danks and Destler additionally jointly own and/or control Opti-Harvest, Inc. ("Opti-Harvest") and Vertical Leap Advisors LLC. ("Vertical Leap"). In 2017, while serving as director of Loop, Defendant Danks was granted power of attorney over a trading account held by Ventanas Capital, LLC ("Ventanas"). As detailed in the SEC Action, Danks utilized the Ventanas brokerage account to trade in Loop shares while concealing his affiliation with the Company. According to Loop's public filings, Defendant Danks received $150,000 during the fiscal year ending February 28, 2018 in compensation from the Company.

20.     Defendant Louise Sams ("Sams") has served as a member of the Board of the Company since April 2021 and serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee and the Compensation Committee. According to the Company's public filings, Defendant Sams received $139,176 during the fiscal year ending February 28, 2022 in compensation from the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

21.     Defendant Laurence Sellyn ("Sellyn") has served as a member of the Board of the Company since April 2018 and serves as Chair of the Audit Committee and as a member of the Compensation Committee. According to the Company's public filings, Defendant Sellyn received $206,250 during the fiscal year ending February 29, 2020 in compensation from the Company.

22.     Defendant Jay Stubina ("Stubina") has served as a member of the Board of the Company since 2016 and serves as a member of the Audit Committee and the Compensation Committee. According to the Company's public filings, Defendant Stubina received $150,000 during the fiscal year ending February 28, 2018 in compensation from the Company.

23.     Defendant Andrew Lapham ("Lapham") has served as a member of the Board of the Company since June 2019 and serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Lapham received $160,840 during the fiscal year ending February 29, 2020 in compensation from the Company.

24.     Defendant Jonghyuk Lee ("Lee") has served as a member of the Board of the Company since July 2021.

25.     Defendant Peter Kezios ("Kezios") served as a member of the Board of the Company between 2020 and 2021. According to the Company's public filings, Defendant Kezios received $90,000 during the fiscal year ending February 28, 2021 in compensation from the Company.

26.     Defendant Sidney Horn ("Horn") served as a member of the Board of the Company between 2018 and 2020. According to the Company's public filings, Defendant Horn received $157,500 during the fiscal year ending February 29, 2020 in compensation from the Company.

27.     Defendant Shaun Higgins ("Higgins") served as a member of the Board of the Company between 2017 and 2019 and served as a member of the Audit Committee. According to the Company's public filings, Defendant Higgins received $150,000 during the fiscal year ending February 28, 2019 in compensation from the Company.

28.     Defendant Leslie Murphy ("Murphy") served as a member of the Board of the Company between 2017 and 2019 and served as Chair of the Audit Committee. According to the

Company's public filings, Defendant Murphy received $150,000 during the fiscal year ending February 28, 2019 in compensation from the Company.

29.     Defendant Brian Young ("Young") served as a member of the Board of the Company between 2016 and 2018.

***Relevant Non-Parties***

30.     David Stephens, along with Destler and Defendant Danks, controlled substantially all of Loop's outstanding unrestricted shares throughout the Relevant Period. Stephens was named as a defendant in the SEC Action and was criminally charged in the Indictment for his alleged involvement in the fraudulent and illegal pump-and-dump scheme described herein.

31.     Jonathan Destler, along with Stephens and Defendant Danks, controlled substantially all of Loop's outstanding unrestricted shares throughout the Relevant Period. Destler is a close business associate of Defendant Danks. Destler was named as a defendant in the SEC Action and was criminally charged in the Indictment for his alleged involvement in the fraudulent and illegal pump-and-dump scheme described herein.

32.     Robert Lazerus worked for Destler and Defendant Danks, identifying and soliciting investors for their various joint ventures. Destler was named as a defendant in the SEC Action and was criminally charged in the Indictment for his alleged involvement in the fraudulent and illegal pump-and-dump scheme described herein. As alleged in the SEC Action and the Indictment, Lazerus, under the direction of Destler and Defendant Danks, manipulated the market for Loop stock by engaging in deceptive and illegal conduct including, *inter alia*, leaking material non-public information with respect to Loop to certain investors.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

33.    By reason of their positions as officers and/or directors of Loop, and because of their ability to control the business and corporate affairs of Loop, the Individual Defendants owed Loop and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Loop in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Loop and its shareholders so as to benefit all shareholders equally.

34.    Each director and officer of the Company owes to Loop and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

35.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Loop, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

36.    To discharge their duties, the officers and directors of Loop were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

37.    Each Loop Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Loop, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

38.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition,

performance, growth, financial statements, products, management, ownership, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

39.   To discharge their duties, the officers and directors of Loop were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Loop were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada and the United States, and pursuant to Loop's own Code of Business Conduct & Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Loop conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Loop and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

9

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Loop's operations would comply with all applicable laws and Loop's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

40.    Each of the Individual Defendants further owed to Loop and the shareholders the duty of loyalty requiring that each favor Loop's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

41.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Loop and were at all times acting within the course and scope of such agency.

42.    Because of their advisory, executive, managerial, and directorial positions with Loop, each of the Individual Defendants had access to adverse, non-public information about the Company.

43.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Loop.

## **LOOP'S CODE OF ETHICS**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

44.     Loop's Code of Ethics, effective January 25, 2017, expressly applies to "all directors, officers, employees of the Company, including the Company's principal executive officer and principal financial officer and other third party contractors (collectively, the 'Covered Persons')." Code of Ethics, 1, 8.

45.     The Code of Ethics begins with a "commit[ment] to the highest level of ethical behavior," and it instructs the Company's "directors, officers and employees to perform with the highest level of integrity and principled business conduct." *Id.* at 1.

46.     The purpose of the Code of Ethics is to:

[D]eter wrongdoing and to promote all of the following:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and business relationships;
- full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "Commission"), and in other public communications made by the Company;
- compliance with applicable governmental laws, rules and regulations;
- the protection of the Company's assets, including corporate opportunities and confidential information;
- fair dealing practices;
- the prompt internal reporting to an appropriate person or persons identified herein for receiving notice of violations or potential violations of this Code; and
- accountability for adherence to this Code

*Id.*

47.     In a section titled "**Honest and Ethical Conduct**" (emphasis in original), the Code of Ethics states, in relevant part:

The Company's policy is to promote high standards of integrity by conducting its affairs honestly and ethically. Each Covered Person must always conduct himself or herself in an honest and ethical manner. Each Covered Person must act with the highest standards of personal and professional integrity and must not tolerate others who attempt to deceive or evade responsibility for actions. Honest and ethical conduct must be a driving force in every decision made by a Covered Person while performing his or her duties for the Company.

*Id.* at 1-2.

48.     In a section titled "**Conflicts of Interest**" (emphasis in original), the Code of Ethics

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

states, in relevant part: "Covered Persons should not use their position or association with the Company for their own or their family's personal gain, and should avoid situations in which their personal interests (or those of their family) conflict or overlap, or appear to conflict or overlap, with the Company's best interests." *Id.* at 2.

49.     In a section titled "**Compliance With Applicable Laws, Rules and Regulations**" (emphasis in original), the Code of Ethics states:

> Full compliance with the letter and the spirit of all applicable governmental laws, rules, and regulations, and applicable rules and listing standards of any national securities exchange on which the Company's securities may be listed, is one of the foundations on which this Company's ethical policies are built. All directors and executive officers of the Company must understand and take responsibility for the Company's compliance with the applicable governmental laws, rules and regulations of the cities, states and countries in which the Company operates, and for complying with the applicable rules and listing standards of any national securities exchange on which the Company's securities may be listed.

*Id.* at 3.

50.     In a section titled "**Rules to Promote Full, Fair, Accurate, Timely and Understandable Disclosures**" (emphasis in original), the Code of Ethics states:

> As a public company, the Company has a responsibility to report financial information to security holders so that they are provided with accurate information in all material respects about the Company's financial condition and results of operations. It is the policy of the Company to fully and fairly disclose the financial condition of the Company in compliance with applicable accounting principles, laws, rules and regulations. Further, it is the Company's policy to promote full, fair, accurate, timely, and understandable disclosure in all of the Company's reports required to be filed with or submitted to the Commission, as required by applicable laws, rules, and regulations then in effect, and in other public communications made by the Company.
>
> \*             \*             \*
>
> The Company is committed to develop and operate a system of internal controls over financial reporting and accounting record, to ensure all transactions are properly authorized and recorded, and are compliant with all applicable laws. The internal controls include but are not limited to written policies and procedures, superior examination and monitoring, budget control, and other inspection and settlement. The Company is committed to developing and operating a system of disclosure procedures to ensure that all information is disclosed in accordance with applicable rules and regulations.

*Id.* at 3-4.

51.     In a section titled "**Trading on Inside Information**" (emphasis in original), the Code of Ethics states:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Inside information includes any non-public information, whether favorable or unfavorable, that investors generally consider important in making investment decisions. Examples include financial results not yet released, imminent regulatory approval/disapproval of an alliance, or other significant matter such as the purchase or sale of a business unit or significant assets, threatened litigation, or other significant facts about a business. No material inside information obtained as the result of employment at, or a director's service on the Board of, the Company may be used for personal profit or as the basis for a direct or indirect "tip" to others, unless such information has previously been made generally available to the public, and even in such circumstances, such information may be subject to other duties.

*Id.* at 5.

52.     In a section titled "**Compliance with the Code; Discipline**" (emphasis in original), the Code of Ethics states, in relevant part:

Violation of this Code may result in serious consequences for the Company, its corporate reputation, and credibility, and the confidence level of its customers, suppliers and investors. Sanctions against the Company for criminal or civil wrongdoing could include substantial fines and restrictions on future operations. Individual employees could be required to pay significant fines or be sentenced to prison. Therefore, violations will be taken seriously.

Company-imposed disciplinary action will be coordinated with the employee's supervisor, the human resources department, and the Chairman of the Audit Committee. *The overall seriousness of the matter will be considered in determining disciplinary action to be taken: which might include consequences up to and including dismissal.* Individual cases may require an employee to reimburse the Company for losses or damages. The Company may even refer an employee for criminal prosecution, civil enforcement or a combination of the above.[1]

*Id.* at 6.

## LOOP'S AUDIT COMMITTEE CHARTER

53.     Pursuant to Loop's Audit Committee Charter, the purpose of the Audit Committee is to:

[A]ssist the Board in its oversight of:

1.     The Company's accounting and financial reporting process and internal control over financial reporting, as well as the audit and integrity of the Company's financial statements.

2.     The Company's compliance with legal and regulatory requirements (including U.S. federal securities law);

---

[1] All emphasis in this Complaint is added unless indicated otherwise.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

3.     The qualifications, independence and performance of the Company's independent auditors; and

4.     The implementation and performance of the Company's internal audit function.

Audit Committee Charter, at 1.

54.    The Audit Committee Charter further provides that the Audit Committee will: Meet with management and the Company's independent auditor to review and discuss the Company's annual audited financial statements and quarterly financial statements. As part of this review process, the Committee shall review:

- the scope and timing of annual audit of the Company's financial statements,
- The Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and Form 10- Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K.
- The results of the independent audit and the quarterly reviews, and the independent auditor's opinion on the audited financial statements.
- the quality and adequacy of the Company's internal controls and discuss with management and the independent auditor any significant deficiencies or material weaknesses in the design or operation of the Company's internal controls;
- major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies.

*Id*. at 3-4.

55.    In a section titled "Internal Audit Function" (emphasis in original), the Audit Committee Charter states that the Audit Committee shall:

- review the responsibilities, functions, qualifications and performance of the Company's internal audit function, including internal audit's charter, plans, budget, objectivity and the scope and results of internal audits;
- approve the hiring, promotion, demotion or termination of the person in charge of the Company's internal or outsourced internal audit function; and
- review the results of the internal audit program, including significant issues in internal audit reports and responses by management.

*Id.* at 4.

56.    The Audit Committee Charter further states that the Audit Committee shall: "review, approve and monitor related party transactions involving directors or executive officers

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and review and monitor conflicts of interest situations involving such individuals where appropriate." *Id.* at 5.

57.     In a section titled "<u>Compliance with Laws</u>" (emphasis in original), the Audit Committee Charter states:

> On at least an annual basis, the Audit Committee shall review and discuss with management and the independent auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs and (ii) reports regarding compliance with applicable laws, regulations and internal compliance programs. The Audit Committee shall discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or policies. The Audit Committee shall discuss with the Company's chief financial officer or senior legal officer any legal matters that may have a material impact on the financial statements or the Company's compliance procedures.

*Id.*

## SUBSTANTIVE ALLEGATIONS

### *Background*

58.     Individuals who exercise control over public companies ("control persons") are subject to various legal and regulatory requirements, including registration requirements, sale restrictions, and disclosure requirements.

59.     Prior to selling stock, control persons are required to: (i) register the stock sales with the SEC pursuant to Section 5 of the Securities Act [15 U.S.C. § 77e]; (ii) sell the stock pursuant to an exemption from registration; or (iii) sell the stock according to the conditions set forth in SEC Rule 144 [17 C.F.R. § 240.144], including volume limitations.  Further, investors in certain public companies are required to disclose any ownership interest in excess of 5% of the company's publicly traded stock.

60.     An "affiliate" of an issuer is a person or entity that, directly or indirectly, controls, is controlled by, or is under common control with such issuer. Affiliates of a public company include officers, directors and controlling shareholders as well as any individual under common control with the company. A "control group," as used herein, refers to a group that collectively is an "affiliate" of an issuer.

61.     "Unrestricted" shares refer to shares that can be freely transferred or sold.

Restricted stock includes stock that has been acquired from an issuer, or an affiliate of an issuer, in a private transaction not registered with the SEC. Further, stock held by an issuer or affiliate of an issuer is restricted. Absent an applicable exemption, an individual may not sell restricted stock to the public without filing a registration statement with the SEC. The Registration Statement must contain, *inter alia*, disclosure of any person, group, or entity who is the beneficial owner of more than 5% of the company's securities.

***Stephens Acquires a Large Portion of Loop's Stock and Engages in Deceptive Conduct to Conceal His Ownership of the Company and Avoid Disclosure and Reporting Requirements***

62.    First American Group Inc., a publicly traded shell company, was formed prior to the Relevant Period. Between 2012 and 2013, all of the unrestricted shares of First American were transferred into eleven separate offshore nominee entities. While each entity appeared distinct, they were all under common ownership and control.

63.    In 2014, Stephens acquired the First American shell corporation and each of the eleven nominee entities.

64.    As detailed in the SEC Action, on October 3, 2014, Destler introduced Stephens to Defendant Solomita via an email, copying Defendant Danks. On that same day, Touchstone Advisors, an entity controlled by Destler and Defendant Danks, entered into a consulting agreement with Loop.

65.    Over the course of the following months, Stephens worked alongside Destler and Defendants Solomita and Danks to explore a possible merger between First American and Loop's predecessor, Loop Holdings.

66.    In June 2015, Loop Holdings and First American completed a reverse merger, whereby the surviving public company changed its name to Loop Industries, Inc. At that time, Loop was a penny stock trading on OTC Link.

67.    As a result of the Merger, all of the purportedly unrestricted shares of First American covertly held by Stephens became purportedly unrestricted shares of Loop, and they

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

16

constituted all of Loop's outstanding unrestricted shares.[2]

68.     Entities holding five percent or more of a company's stock are required to report their beneficial ownership pursuant to the Exchange Act. Furthermore, stock ownership positions over five percent of a public company typically attract a higher level of scrutiny by brokerage firms.

69.     As Stephens exercised control over each of the eleven nominee entities, he too controlled all of the roughly 6.5 million outstanding unrestricted shares of Loop, which had become a public company as a result of the Merger. However, as the shares appeared to be owned by several distinct entities, each holding less than five percent of the Company's stock, Stephens was able to avoid reporting his beneficial ownership under the relevant provisions of the Exchange Act and conceal from transfer agents, brokerage firms and the public that he was the beneficial owner of all of the outstanding shares of the purportedly unrestricted Loop stock.

70.     At the time of the Merger, Defendant Solomita became CEO and President of Loop and Chairman of its Board of Directors, and Defendant Danks became a member of the Company's Board. As there were only a small number of directors on the Loop Board, the position was one of trust and confidence, and Defendants Solomita and Danks maintained a close working relationship.

71.     Furthermore, Defendant Danks had a very close business relationship with Destler. Destler owns Touchstone Advisors with a relative, and Danks is a Managing Director of that company. Additionally, Danks and Destler maintain joint control over another limited liability company, Vertical Leap Advisors LLC ("Vertical Leap"). At the time of the Merger, Loop maintained the same corporate address as Touchstone Advisors, Vertical Leap, and other companies associated with Destler and Defendant Danks.

72.     Thus, by the start of the Relevant Period, Stephens had covertly acquired all of the unrestricted shares of Loop stock, Defendant Danks had become a member of the Loop Board,

---

[2] These were not actually unrestricted shares, as Stephens, as a controlling shareholder of Loop, was an affiliate of Loop.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and Destler, a close business associate of Defendant Danks, had become a consultant to Loop.

73. In November 2015, shortly after the Merger, Stephens began transferring Loop stock to Destler and Defendant Danks through the nominee entities that Stephens controlled. As detailed in the SEC Action, the nature of these transfers—to multiple different entities and often with little to no compensation—suggested that Stephens, Destler, and Defendant Danks had been working together for the common purpose of concealing the ownership of large amounts of Loop stock.

74. As affiliates of Loop who exercised control over the Company, Stephens, Destler, and Defendant Danks were subject to various disclosure, registration, and reporting requirements pursuant to the Securities Act and the Exchange Act. Stephens, Destler, and Defendant Danks orchestrated a scheme to avoid these legal requirements along with the additional scrutiny that would come if market participants understood the extent of their ownership and control of the Company.

75. Stephens continued to covertly transfer Loop shares to entities controlled by Destler and Defendant Danks until at least October 2017.

***Defendant Danks Solicits Robert Lazerus to Manipulate the Market for Loop Stock, Allowing Stephens, Destler, and Defendant Danks to Dump Their Shares of Loop Stock at Artificially Inflated Prices***

76. Robert Lazerus was an associate of Destler and Defendant Danks, and he helped to solicit investors for their joint business ventures. Under the direction of Destler and Defendant Danks, Lazerus misleadingly promoted the stock, including by inducing an 86-year-old retiree (the "Elderly Investor") to purchase more than $7 million in Loop stock by the end of the Relevant Period—including by purchasing Loop stock "on margin," *i.e.,* purchasing Loop stock with funds borrowed from his brokerage firm. From 2015 to 2019, Lazerus exploited a relationship of trust and confidence with the Elderly Investor, and Defendant Danks worked with Lazerus to time the Elderly Investor's stock purchases strategically. For example, the Elderly Investor's stock purchases served to artificially inflate the price of Loop stock and support the stock's up-list from trading on the OTC Markets to trading on the NASDAQ exchange, a move that, itself, further

inflated the price of Loop stock.

77.     As detailed in the SEC Action, from between March and December 2017 in particular, the Elderly Investor's purchases constituted more than 50% of the market volume for Loop stock and significantly impacted its price:



78.     Defendant Danks directed Lazerus to encourage the Elderly Investor to purchase stock on specific days.  As detailed in the SEC Action, Defendant Danks sent a series of messages to Lazerus on November 1 and 2, 2017, when Loop stock was being evaluated for uplisting to the NASDAQ exchange:

| Date | Message |
|------|---------|
| 11/1/2017 | "Robert, Can u get [Elderly Investor] to buy 4-5k shares a day for next week or so?  Thx.  Call u around noon with some updates" |
| 11/2/2017 | "Any luck with [Elderly Investor] in the market...We need the stock to firm up at about $13-$14" |
| 11/2/2017 | "???We're negotiating with lender and need price up to set warrant prices.  Let me know if [Elderly Investor] can help..." |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

79.     Destler and Defendant Danks compensated Lazerus for the Elderly Investor's transactions either with cash or by transferring Loop stock to him.

80.     In addition to having Lazerus persuade the Elderly Investor to purchase millions in Loop stock at opportune times, Destler and Defendant Danks assisted Lazerus in promoting Loop stock by passing material, non-public information about Loop to various "tippees," including an undercover FBI agent posing as an investor.

81.     As detailed in the Indictment, Lazerus worked with Destler and Defendant Danks to raise money for Loop as far back as 2016. In a September 22, 2016 email, Defendant Danks stated to Defendant Solomita that "Coach and Robert Lazerus are just doing stock. They are both sending invoices."

82.     Beginning in February 2020, Lazerus began regularly communicating with an undercover agent ("UCA"), providing the UCA with material non-public information concerning Loop in exchange for a portion of the profits that Lazerus believed the UCA would generate from trading based on that information.

83.     For example, during a telephone call on May 6, 2020, Lazerus informed the UCA that Loop would be announcing news in six weeks. The following day, Lazerus advised the UCA to purchase shares of Loop in small amounts and offered to put the UCA in touch with his partner, Jonathan Destler.

84.     On June 16, 2020, Lazerus met with the UCA in person and informed the UCA that Loop would announce a new contract in two months. At that meeting, Lazerus requested that the UCA compensate him with 10% of profits realized from trading on the information.

85.     On June 18, 2020, during a WhatsApp telephone call, Lazerus informed the UCA that Loop would be signing a two-million-dollar contract with Coke in six weeks. During that call, Lazerus also told the UCA that he preferred to use WhatsApp for further communications.

86.     On September 9, 2020, Lazerus sent the UCA a WhatsApp message, stating: "news tomorrow on LOOP." Loop stock closed at $12.46 per share that day. The following day, Loop issued a press release titled "LOOP Industries and Suez Announce Strategic Partnership to Build First Infinite LOOP Facility Producing 100% Recycled and Infinitely Recyclable Plastic in

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Europe." On September 10, 2020, Loop stock closed at $12.98 per share, a 4% increase in one day.

87.    On December 4, 2020, the UCA informed Lazerus that he had profited off of the Loop tip, and he paid Lazerus $4,150 in cash, purportedly constituting 10% of UCA's profit.

88.    Throughout 2021, Lazerus continued to provide the UCA with material non-public information pertaining to Loop. On May 20, 2021, Lazerus met with the UCA in person and informed him that Loop would announce an agreement with SK Group around June 1, 2021. During that meeting, the UCA and Lazerus agreed to increase Lazerus' compensation from 10% to 20% of the UCA's profits. They also discussed establishing an offshore brokerage account to facilitate stock trading and the transfer of funds with limited government scrutiny.

89.    On June 22, 2021, Loop's stock closed at $13.19 per share. On June 23, Loop issued a press release titled "SK Global Chemical to Acquire 10% Equity Stake in Loop Industries, Companies Announce Strategic Partnership to Bring Sustainable and Circular Plastics to Asian Market." Loop stock closed at $15.90 after the announcement on June 23, 2021, a 21% increase in price in just one day.

90.    On December 9, 2021, Lazerus met with the UCA and informed the UCA of additional upcoming news pertaining to the Company. During that meeting, the UCA handed Lazerus an envelope containing $5,000 in cash and indicated to Lazerus that it was a portion of the profits generated from the UCA's recent sale of Loop stock.

91.    As detailed in the Indictment, Lazerus provided material non-public information pertaining to Loop to at least three other individuals identified by the SEC throughout 2020 and 2021 to promote the stock. The Indictment further alleges that Lazerus provided investors material non-public information pertaining to Opti-Harvest, Inc., another joint venture of Destler and Defendant Danks.

***Stephens, Destler, and Defendant Danks Dump Loop Stock into the Public Market at Artificially Inflated Prices, Selling Stock to Investors Who Were Unaware of Their Ownership of a Significant Amount of Loop Stock***

92.    In order to avoid legal and regulatory requirements, Stephens, Destler, and Defendant Danks worked together to conceal their ownership of Loop stock, transferring and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

selling stock between various entities that they controlled for little to no compensation. Thus, when they sold Loop stock in the public market, purchasers were unaware that they were acquiring shares from individuals that, collectively, controlled the Company.

93.    In one instance of such deceptive conduct, Stephens directed an associate ("Associate A") to sell his Loop shares into the United States public market using nominee entities controlled by Associate A. Between October 2017 and February 2018, Associate A sold Stephens' Loop shares through a Singaporean brokerage account for proceeds of $1,684,000, wiring 95% of the proceeds to Stephens' bank account and keeping the balance.

94.    In another instance, Stephens acquired Loop shares from four of the eleven nominee companies, for no apparent consideration, and then transferred the stock into a nominee entity controlled by Associate A. Between June and August 2017, Associate A proceeded to sell that stock in the United States public market through a Hong Kong brokerage account, generating $1.1 million and wiring 96% of the proceeds to Stephens' personal bank account.

95.    In another instance of deceptive and misleading conduct, in the fall of 2017, Stephens transferred 122,650 shares of Loop stock from three of the nominee entities he controlled to Touchstone Advisors, an entity controlled by Destler and Defendant Danks. A few days later, Touchstone Advisors, brokered by Lazerus, sold all of those shares to the Elderly Investor for $1,410,475. Touchstone Advisors then wired $1,318,487 to Stephens, retaining $91,988 in commission. A third of that commission was then placed into to a trust benefitting the Danks family, and another third was paid to Lazerus, leaving the remainder in the Touchstone Advisors bank account. This allowed Stephens, Destler, and Defendant Danks to sell Loop stock to the Elderly Investor without him knowing that he was purchasing stock from individuals who collectively owned and controlled the company.

96.    Ventanas Capital LLC was another entity used to conceal the ownership of Loop stock. The nominal owner of Ventanas ("Associate B") maintained a long-time friendship and close relationship with Defendant Danks, and Danks exercised control over the Ventanas brokerage account both directly and indirectly, through his relationship with Associate B. Beginning in October 2015 and throughout 2016, Ventanas received Loop shares from

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Touchstone Advisors, Vertical Leap and a trust benefitting the Danks family. These transfers provided Defendant Danks with another vehicle to sell his securities while concealing his effective ownership and control of them. For each transfer, Ventanas either paid significantly less than the market value of Loop stock or paid no consideration at all.

97.    Furthermore, in 2017, while serving as director of Loop, Defendant Danks was granted power of attorney over a trading account held by Ventanas. Despite Danks' role as a director of Loop at that time, the Power of Attorney form on file with Charles Schwab, granting Defendant Danks trading authority over the Ventanas brokerage account, indicated that Danks was not a "director, 10% shareholder or policy making officer of a publicly held company." Accordingly, Danks was able to utilize the Ventanas brokerage account to trade in Loop shares while concealing his affiliation with the Company.

***Stephens, Lazerus, Destler, and Defendants Danks and Solomita Profited From the Fraudulent Scheme***

98.    Defendant Danks, working with Destler and Lazarus, successfully manipulated the market for Loop stock. Stephens, Destler, Lazarus, and Defendant Danks were then able to reap millions of dollars in profits by fraudulently offloading their shares at artificially inflated prices to investors who were wholly unaware that they were purchasing stock from individuals who controlled the Company.

99.    Further, as alleged in the Indictment, Defendant Danks laundered proceeds from the fraudulent scheme, using more than $500,000 in funds obtained through a margin loan on his Loop shares to finance the purchase of a home in Southern California.

100.    Additionally, Defendant Solomita profited from the pump-and-dump scheme through a series of transfers involving Ventanas. In October 2015, Ventanas began to acquire Loop shares from both the Stephens-controlled nominee entities and from Vertical Leap, an entity owned by Destler and Defendant Danks. On or around October 20, 2015, after Stephens transferred the Loop shares to Ventanas, Defendant Danks helped to facilitate the sale of 400,000 of Ventanas' shares to a Quebec Company, Company A. Company A then paid Ventanas $439,490 for the shares on October 20, 2015. Two days later, Ventanas wired $413,875 (95% of

the proceeds) to 8198381 Canada, Inc., Defendant's Solomita's Company. While communications between Defendants Danks and Solomita characterized that payment as a "loan," there is no evidence that the purported loan was ever memorialized in writing or repaid.

***The Truth Emerges***

101. On September 30, 2022, the SEC filed a complaint against Defendant Danks, Stephens, Destler, and Lazerus, alleging violations of antifraud provisions of the Exchange Act. As a result of the SEC Action, the price of Loop stock fell dramatically, closing at $3.89 on October 3, 2022, an almost 14% decline from the stock's opening price of $4.51 on September 30, 2022, just one trading day earlier. The price of the Company's stock has never recovered, closing at $3.06 per share on August 4, 2023.

102. On November 22, 2022, the United States filed a grand jury indictment in connection with the pump-and-dump scheme, alleging that Defendant Danks conspired to commit securities fraud and committed securities fraud along with Lazerus, Stephens, and Destler, and that Danks laundered a portion of the proceeds, acquiring a more than $500,000 margin loan from his Loop shares to finance the purchase of a home in Southern California. The Indictment further alleged that in his efforts to solicit investor interest in Loop and drive up the price of its stock, Lazerus provided material non-public information with respect to the Company to various "tippees," including an undercover FBI agent posing as an investor, in exchange for commission.

***False and Misleading Statements***

103. Throughout the Relevant Period, the Individual Defendants advanced the deceptive and fraudulent pump-and-dump scheme by issuing false and misleading statements regarding the ownership and control of Loop stock.

104. On June 15, 2016, Loop filed an annual report on Form 10-K with the SEC (the "2016 10-K"), signed by Defendants Solomita and Danks. With respect to ownership and control of Loop stock, the 2016 10-K stated:

> The following table lists, as of February 29, 2016, the number of shares of common stock of our Company that are beneficially owned by (i) each person or entity known to our Company to be the beneficial owner of more than 5% of the outstanding common stock; (ii) each officer and director of our Company; and (iii) all officers and directors as a group.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Title of Class | Name and Address of Beneficial Owner (5) | Amount and Nature of Beneficial Ownership (4) | Percent of Common Stock (1) |
|---|---|---|---|
| Common Stock | Daniel Solomita (2) | 17,000,000 | 56.8% |
| Common Stock | Donald Danks (3) | 1,000,000 | 3.3% |
| All directors and executive officers as a group (2 persons) | | 18,000,000 | 60.1% |

105.   With respect to Loop stock held by non-affiliates of the Company, the 2016 10-K stated:

At August 31, 2015, the last business day of the Registrant's most recently completed second fiscal quarter, the aggregate market value of the voting common stock held by non-affiliates of the Registrant (without admitting that any person whose shares are not included in such calculation is an affiliate) was approximately $12,519,448. At June 7, 2016, there were 30,768,135 shares of the Registrant's common stock, par value $0.0001 per share, outstanding.

106.   With respect to the Company's "[e]xecutive officers, directors, and greater-than-ten percent stockholders," the 2016 10-K stated:

Section 16(a) of the Securities Exchange Act of 1934 requires our executive officers and directors, and persons who own more than ten percent of a registered class of our equity securities, file reports of ownership and changes in ownership with the SEC. Executive officers, directors and greater-than-ten percent stockholders are required by SEC regulations to furnish us with all Section 16(a) forms they file. Based on our review of filings made on the SEC website, and the fact of us not receiving certain forms or written representations from certain reporting persons that they have complied with the relevant filing requirements, we believe that, *during the year ended February 29, 2016, one of our two executive officers, directors and greater-than-ten percent stockholders complied with all Section 16(a) filing requirements, that person being Daniel Solomita.*

107.   The statements on the 2016 10-K were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) by the time the statements were made, Stephens was a greater-than-ten percent stockholder subject to the Exchange Act disclosure requirements; (ii) Stephens had in fact acquired all or virtually all of the outstanding unrestricted stock of the Company; and accordingly (iii) all or virtually all of the Company's outstanding unrestricted stock was held by a controlling shareholder and affiliate of Loop.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

25

108.   On May 30, 2017, Loop filed an annual report on Form 10-K with the SEC (the "2017 10-K"), signed by Defendants Solomita, Danks, Young, and Stubina. The 2017 10-K disclosed the beneficial owners of more than 5% of Loop's common stock:

> The following table sets forth certain information as of May 11, 2017 with respect to the holdings of: (1) each person known to us to be the beneficial owner of more than 5% of our common stock; (2) each Named Executive Officer, (2) each current director; and (3) all directors and executive officers as a group.

| Name and Address of Beneficial Owner | Shares of Common Stock | Percent of Common Stock | Shares of Series A Preferred Stock | Percent of Preferred Stock | Voting Shares | Percent of Voting Shares |
|---|---|---|---|---|---|---|
| Daniel Solomita (1) | 18,600,000 | 57.06% | 1 | 100% | 60,533,893 | 81.22% |
| Donald Danks (2) | 1,404,000 | 4.31% | - | - | 1,404,000 | 1.88% |
| Brian Young (3) | 206,660 | * | - | - | 206,660 | * |
| Jay Stubina (4) | 75,000 | * | - | - | 75,000 | * |
| Cesar Contla (5) | 12,500 | * | - | - | 12,500 | * |
| All Directors and Executive Officers as a Group (6 persons) (6) | 20,348,100 | 62.31% | 1 | 100% | 62,281,993 | 83.50% |

109.   This disclosure was materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because, by the time the statement was made, Stephens had begun transferring stock to Destler and Defendant Danks as part of the pump-and-dump scheme. Accordingly, at the time this statement was made, the control group consisting of Stephens, Destler, and Defendant Danks beneficially owned and controlled most if not all of the Company's outstanding unrestricted stock.

110.   The 2017 10-K similarly failed to disclose the control group in its report on the disclosure requirements of Section 16(A) of the Exchange Act:

> Section 16(a) of the Exchange Act, requires that our directors and executive officers and persons who beneficially own more than 10% of our common stock (referred to herein as the "Reporting Persons") file with the SEC various reports as to their ownership of and activities relating to our common stock. Based solely upon our review of certain reports files with the SEC with respect to Section 16(a) of the Exchange Act, the reports that were required to be filed with respect to transactions in our common stock during the fiscal year ended February 27, 2017 were timely except each of D. Jennifer Rhee, Jay Stubina, Brian Young and Donald Danks failed to timely file an initial Form 3 and Daniel Solomita failed to timely file Form 4s reflecting share issuances in 2016. Ms. Rhee filed a Form 3 on April 20, 2017.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

26

111.   The 2017 10-K further obscured the ownership and control of Loop stock by repeatedly referring to Defendant Solomita as the "President and Chief Executive Officer, Chairman of the BOD, and **_majority stockholder._**"

112.   On November 20, 2017, the Individual Defendants issued a press release announcing that Loop's stock had been uplisted and would begin trading on the NASDAQ. That press release quoted Defendant Solomita as stating:

> The listing of our shares on The NASDAQ Global Market represents a very exciting and important milestone for Loop as we move forward with our planned expansion and path to commercialization for our revolutionary technology . . . We believe listing on NASDAQ will open new doors for our Company with heightened exposure, better access to Wall Street and stronger liquidity. We look forward to sharing our investment story with a global audience as we continue our groundbreaking work in accelerating the world's shift toward sustainable plastic.

113.   This statement was materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because it failed to disclose that Loop stock had actually been uplisted as a result of market manipulation. Specifically, Defendant Danks had been directing Lazerus to solicit timely acquisitions of Loop stock to ensure growth in the price of the Company's stock during its evaluation for uplisting onto the NASDAQ.

114.   On May 18, 2018, the Individual Defendants issued a Proxy Statement (the "2018 Proxy"). The 2018 Proxy stated:

> The following table sets forth certain information with respect to the beneficial ownership of our Common Stock and Series A Preferred Stock as at May 4, 2018, as to (1) each person (or group of affiliated persons) who is known by us to own beneficially more than 5% of our Common Stock; (2) each of our directors and nominees; (3) each Named Executive Officer; and (4) all of our directors and executive officers as a group.

| Name and Address of Beneficial Owner | Shares of Common Stock | Percent of Common Stock | Shares of Series A Preferred Stock | Percent of Preferred Stock | Combined Voting Shares | Combined Voting Power |
|---|---|---|---|---|---|---|
| Daniel Solomita[(1)] | 19,600,000 | 56.37% | 1 | 100% | 63,715,545 | 80.77% |
| Frank Zitella | — | — | — | — | — | — |
| Antonella Penta | 150,000 | * | — | — | 150,000 | * |
| Donald Danks[(2)] | 1,413,560 | 4.18% | — | — | 1,413,560 | 1.81% |
| Jay Stubina[(3)] | 84,560 | * | — | — | 84,560 | * |
| Laurence Sellyn | 1,695 | * | — | — | 1,695 | * |
| Leslie Murphy[(4)] | 8,774 | * | — | — | 8,774 | * |
| Shaun Higgins[(4)] | 6,208 | * | — | — | 6,208 | * |
| Cesar Contla[(5)] | 12,500 | * | — | — | 12,500 | * |
| D. Jennifer Rhee | — | — | — | — | — | — |
| All Directors and Executive Officers as a Group (10 persons) | 21,277,297 | 60.56% | 1 | 100% | 65,392,842 | 82.58% |

115.   The above table was incorporated by reference into the Company's Form 10-K, filed with the SEC on May 14, 2018 and signed by Defendants Solomita, Danks, Higgins, Murphy, Sellyn, and Stubina (the "2018 10-K"). This disclosure was materially false and misleading and omitted to state material adverse facts because it failed to disclose that, by the time the statement was made, the control group consisting of Stephens, Destler, and Defendant Danks beneficially owned and controlled most if not all of the Company's outstanding unrestricted stock.

116.   The 2018 10-K further stated that "[t]o date, the Company has been successful in raising capital to finance its ongoing operations at successively higher valuations, reflecting investors' belief in the potential for commercializing the Company's branded resin and the progress made to date in implementing its business plans." This statement was materially false and highly misleading because the Company's ability to raise capital was largely due to market manipulation and was not a reflection of investors' belief in Loop's potential.

117.   The 2018 10-K contained the following risk disclosures regarding the Company's stock price:

**Trading volume in our stock can fluctuate and an active trading market for our common stock may not be available on a consistent basis to provide stockholders with adequate liquidity. Our stock price may be volatile and our stockholders could incur significant investment losses.**

The trading price for our common stock will be affected by a number of factors, including:

- Any change in the status of our Nasdaq listing;

- The need for near-term financing to continue operations;

- Reported progress in our efforts to develop and commercialize our technology, relative to investor expectations;

- General market conditions and other factors unrelated to our operating performance or the operating performance of our competitors;

- Future issuances and/or sales of our securities;

- Announcements or the absence of announcements by us, or our competitors, regarding collaborations, new products, significant contracts, commercial relationships or capital commitments;

- Commencement of, or involvement in, litigation;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Any major change in our board of directors or management;

- Changes in governmental regulations or in the status of our regulatory approvals;

- Announcements related to patents issued to us or our competitors and to litigation involving our intellectual property;

- A lack of, or limited, or negative industry or security analyst coverage;

- Uncertainty regarding our ability to secure additional cash resources with which to operate our business;

- Short-selling or similar activities by third parties; and
- Other factors described elsewhere in these Risk Factors

*          *          *

In addition, sales of significant amounts of shares held by Mr. Solomita, or the prospect of these sales, could adversely affect the market price of our common stock. Management's stock ownership may discourage a potential acquirer from making a tender offer or otherwise attempting to obtain control of us, which in turn could reduce our stock price or prevent our stockholders from realizing a premium over our stock price.

(Emphasis in original).

118.   The risk disclosures were materially false and misleading and omitted to state material adverse facts because they failed to disclose that: (i) the Company's stock price was being supported by market manipulation and was thus highly inflated, and (ii) the control group consisting of Stephens, Destler, and Defendant Danks beneficially owned and controlled most if not all of the Company's outstanding unrestricted stock.

119.   On May 10, 2019, the Individual Defendants issued a Proxy Statement (the "2019 Proxy"). The 2019 Proxy stated:

The following table sets forth certain information with respect to the beneficial ownership of our Common Stock and Series A Preferred Stock as at May 2, 2019, as to (1) each person (or group of affiliated persons) who is known by us to own beneficially more than 5% of our Common Stock; (2) each of our directors and nominees; (3) each Named Executive Officer; and (4) all of our directors and executive officers as a group.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Name and Address of Beneficial Owner | Shares of Common Stock (1) | Percent of Common Stock | Shares of Series A Preferred Stock | Percent of Preferred Stock | Combined Voting Shares | Combined Voting Power |
|---|---|---|---|---|---|---|
| Daniel Solomita[2] | 19,600,000 | 54.63% | 1 | 100% | 65,767,917 | 80.16% |
| Nelson Gentiletti | - | * | - | - | - | * |
| Nelson Switzer | 7,043 | * | - | - | 7,043 | * |
| Jay Stubina[3] | 97,902 | * | - | - | 97,902 | * |
| Laurence Sellyn[4] | 20,037 | * | - | - | 20,037 | * |
| Leslie Murphy[5] | 22,116 | * | - | - | 22,116 | * |
| Shaun Higgins[6] | 19,550 | * | - | - | 19,550 | * |
| Sidney Horn[7] | 10,205 | * | - | - | 10,205 | * |
| Antonella Penta | - | * | - | - | - | * |
| Frank Zitella | - | * | - | - | - | * |
| All Directors and Executive Officers as a Group (10 persons) | 19,776,853 | 55.14% | 1 | 100% | 65,944,770 | 80.38% |

120.   The above table was incorporated by reference into the Company's Form 10-K, filed with the SEC on May 8, 2019 and signed by Defendants Solomita, Horn, Higgins, Murphy, Sellyn, and Stubina (the "2019 10-K"). This disclosure was materially false and misleading and omitted to state material adverse facts because, by the time the statement was made, the control group consisting of Stephens, Destler, and Defendant Danks beneficially owned and controlled most if not all of the Company's outstanding unrestricted stock.

121.   The 2019 10-K repeated the statements contained in the 2018 10-K, attributing the Company's ability to raise capital to its business prospects and execution:

> Loop is a development stage company with no revenues, and our ongoing operations are being financed by raising new equity and debt capital. ***To date, we have been successful in raising capital to finance our ongoing operations, reflecting the potential for commercializing our branded resin and the progress made to date in implementing our business plans.***

122.   On May 4, 2020, the Individual Defendants issued a Proxy Statement (the "2020 Proxy"). The 2020 Proxy stated:

> The following table sets forth certain information with respect to the beneficial ownership of our Common Stock and Series A Preferred Stock as at May 1, 2020, as to (1) each person (or group of affiliated persons) who is known by us to own beneficially more than 5% of our Common Stock; (2) each of our directors and nominees; (3) each Named Executive Officer; and (4) all of our directors and executive officers as a group.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Name and Address of Beneficial Owner | Shares of Common Stock[1] (#) | Percent of Common Stock (%) | Shares of Series A Preferred Stock (#) | Percent of Preferred Stock (%) | Combined Voting Shares (#) | Combined Voting Power (%) |
|---|---|---|---|---|---|---|
| Daniel Solomita[2] | 18,800,000 | 47.10 | 1 | 100 | 74,131,395 | 77.83 |
| Nelson Gentiletti | 7,083 | * | - | - | 7,083 | * |
| Michel Megelas | - | - | - | - | - | - |
| Jay Stubina[3] | 116,207 | * | - | - | 116,207 | * |
| Laurence Sellyn[4] | 43,342 | * | - | - | 43,342 | * |
| Andrew Lapham[5] | 18,033 | * | - | - | 18,033 | * |
| Sidney Horn[6] | 23,510 | * | - | - | 23,510 | * |
| Nelson Switzer[7] | 7,043 | - | - | - | 7,043 | * |
| All Directors and Executive Officers as a Group (8 persons) | 19,015,218 | 47.64 | 1 | 100 | 74,346,613 | 78.06 |

123.   The above table was incorporated by reference into the Company's Form 10-K, filed with the SEC on May 5, 2020 and signed by Defendants Solomita, Horn, Stubina, Lapham, and Sellyn (the "2020 10-K"). This disclosure was materially false and misleading and omitted to state material adverse facts because it failed to disclose that, by the time the statement was made, the control group consisting of Stephens, Destler, and Defendant Danks beneficially owned and controlled most if not all of the Company's outstanding unrestricted stock.

124.   On May 28, 2021, the Individual Defendants issued a Proxy Statement (the "2021 Proxy"). The 2021 Proxy stated:

> The following table sets forth certain information with respect to the beneficial ownership of our Common Stock and Series A Preferred Stock as at May 4, 2021 as to (1) each person (or group of affiliated persons) who is known by us to own beneficially more than 5% of our Common Stock; (2) each of our directors and nominees; (3) each Named Executive Officer; and (4) all of our directors and executive officers as a group.

> Subject to the paragraph above, percentage ownership of outstanding shares is based on 42,433,320 shares of Common Stock outstanding and one share of Series A Preferred Stock outstanding as of May 4, 2021.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Name and Address of Beneficial Owner | Shares of Common Stock[1] (#) | Percent of Common Stock (%) | Shares of Series A Preferred Stock (#) | Percent of Preferred Stock (%) | Combined Voting Shares (#) | Combined Voting Power (%) |
|---|---|---|---|---|---|---|
| Daniel Solomita[2] | 19,910,000 | 44.80 | 1 | 100 | 78,804,737 | 77.09 |
| Nelson Gentiletti | 27,664 | * | — | — | 27,664 | * |
| Drew Hickey[3] | — | — | — | — | — | — |
| Michel Megelas | — | — | — | — | — | — |
| Stephen Champagne | — | — | — | — | — | — |
| Yves Perron | — | — | — | — | — | — |
| Jay Stubina[4] | 135,869 | * | — | — | 135,869 | * |
| Laurence Sellyn[5] | 68,004 | * | — | — | 68,004 | * |
| Andrew Lapham[6] | 8,174,829 | 17.56 | — | — | 8,174,829 | 7.69 |
| Peter Kezios[7] | 9,662 | * | — | — | 9,662 | * |
| Louise Sams[8] | — | — | — | — | — | — |
| All Directors and Executive Officers as a Group (10 persons) | 27,449,538 | 62.98 | 1 | 100 | 87,244,275 | 85.03 |

125.   The above table was incorporated by reference into the Company's Form 10-K, filed with the SEC on June 1, 2021 and signed by Defendants Solomita, Kezios, Stubina, Lapham, Sellyn, and Sams (the "2021 10-K"). This disclosure was materially false and misleading and omitted to state material adverse facts because, by the time the statement was made, the control group consisting of Stephens, Destler, and Defendant Danks beneficially owned and controlled most if not all of the Company's outstanding unrestricted stock.

126.   On May 27, 2022, the Individual Defendants issued a Proxy Statement (the "2022 Proxy"). The 2022 Proxy stated:

The following table sets forth certain information with respect to the beneficial ownership of our Common Stock and Series A Preferred Stock as at May 4, 2022 as to (1) each person (or group of affiliated persons) who is known by us to own beneficially more than 5% of our Common Stock; (2) each of our directors and nominees; (3) each Named Executive Officer; and (4) all of our directors and executive officers as a group.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

32

| Name and Address of Beneficial Owner | Shares of Common Stock(1) (#) | Percent of Common Stock (%) | Shares Series A Preferred Stock (#) | Percent of Preferred Stock (%) | Combined Voting Shares (#) | Combined Voting Power (%) |
|---|---|---|---|---|---|---|
| ***Directors and Executive Officers***(2) | | | | | | |
| Daniel Solomita(3) | 19,210,000 | 37.2 | 1 | 100 | 88,029,888 | 73.1 |
| Drew Hickey | — | — | — | — | — | — |
| Stephen Champagne | 5,800 | * | — | — | 5,800 | * |
| Yves Perron | — | — | — | — | — | — |
| Andrew Lapham(4) | 8,183,125 | 15.8 | — | — | 8,183,125 | 6.8 |
| Jonghyuk Lee | — | — | — | — | — | — |
| Louise Sams(5) | 10,665 | * | — | — | 10,665 | * |
| Laurence Sellyn(6) | 81,300 | * | — | — | 81,300 | * |
| Jay Stubina(7) | 144,165 | * | — | — | 144,165 | * |
| All Directors and Executive Officers as a Group (9 persons) | 27,635,055 | 53.5 | 1 | 100 | 96,454,943 | 80.0 |
| | | | | | | |
| ***Greater than 5% Stockholders*** | | | | | | |
| SK geo centric Co., Ltd(8)<br>26, Jong-ro,<br>Jongno-gu<br>Seoul, Korea<br>03118 | 9,890,924 | 18.8 | — | — | 9,890,924 | 8.2 |

127.   The above table was incorporated by reference into the Company's Form 10-K, filed with the SEC on May 27, 2022 and signed by Defendants Solomita, Sellyn, Lapham, Lee, Sams, and Stubina (the "2022 10-K"). This disclosure was materially false and misleading and omitted to state material adverse facts because, by the time the statement was made, the control group consisting of Stephens, Destler, and Defendant Danks beneficially owned and controlled most if not all of the Company's outstanding unrestricted stock.

128.   The 2022 10-K contained the following risk disclosures regarding the Company's stock price:

**Trading volume in our stock can fluctuate and an active trading market for our common stock may not be available on a consistent basis to provide stockholders with adequate liquidity. Our stock price may be volatile and our stockholders could incur significant investment losses.**

The trading price for our common stock will be affected by a number of factors, including:

- Any change in the status of our Nasdaq listing;

- The need for near-term financing to continue operations;

- Our ability to develop and commercialize our technology, relative to investor expectations;

- General market conditions and other factors unrelated to our operating performance or the operating performance of our competitors;

- Volatility in the financial and credit markets, including the recent volatility due, in part, to the current COVID-19 outbreak and geo-political events;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Future issuances and/or sales of our securities;

- Announcements or the absence of announcements by us, or our competitors, regarding collaborations, new products, significant contracts, commercial relationships or capital commitments;

- Commencement of, or involvement in, litigation *or investigations*;

- Any major change in our board of directors or management;

- Changes in governmental regulations or in the status of our regulatory approvals;

- Announcements related to patents issued to us or our competitors and to litigation involving our intellectual property;

- A lack of, or limited, or negative industry or security analyst coverage;
- Uncertainty regarding our ability to secure additional cash resources with which to operate our business;

- Short-selling or similar activities by third parties;

- Limited trading activity in our shares and any short positions held; and

- Other factors described elsewhere in these Risk Factors.

129.   These risk disclosures were materially false and misleading and omitted to state material adverse facts because they failed to disclose that: (i) the Company's stock price was being supported by market manipulation and was thus materially inflated; and (ii) the control group consisting of Stephens, Destler, and Defendant Danks beneficially owned and controlled most if not all of the Company's outstanding unrestricted stock.

**Harm to the Company**

130.   Each of the Individual Defendants, directly or indirectly, perpetrated and/or profited from the illegal pump-and-dump scheme.

131.   As a direct and proximate result of the Individual Defendants' misconduct outlined herein, the Company's ability to maintain adequate financing through equity offerings has been jeopardized. According to the Company's 2023 Form 10-K, filed with the SEC on May , 2023, the ability to secure adequate equity financing is critical to Loop's ability to maintain operations:

### RISKS RELATING TO OUR BUSINESS AND TECHNOLOGY

*We have incurred net losses since inception. We expect to continue to incur losses for the foreseeable future and may never achieve or maintain profitability. We have never generated material revenue and may never be profitable.*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Since our inception in 2010, we have incurred net losses. Our net loss for the year ended February 28, 2023 was $21.30 million and we have earned limited revenues to date. *We have financed our operations primarily through sales of common stock* and incurrence of debt and have devoted substantial efforts to research and development, as well as building our team. We expect to continue to incur significant expenses and operating losses for the foreseeable future.

\*     \*     \*

**_We may not be able to execute our business plan or stay in business without additional funding._**

 Our ability to successfully commercialize our business and generate future revenues depends on whether we can obtain the necessary financing to implement our business plan, on acceptable terms. *We will require additional financing through a combination of the issuance of debt, equity, and/or joint ventures and/or government incentive programs in order to establish profitable operations, and such financing may not be forthcoming.* We are pursuing financial incentives and financing for our proposed projects with several countries through multiple programs that involve various branches of government. If we are unable to attract government incentives and financing to our projects or investors to invest in our business, *we may not be able to acquire additional financing through debt or equity markets. Our failure to secure additional financing on favorable terms when it becomes required would have an adverse effect on our ability to execute our business plan or remain in business.*

*Id.*, p. 15 (emphasis added).

132.   The price of Loop's common stock has never recovered from the disclosure of the pump-and-dump scheme, closing at $3.06 per share on August 4, 2023, as compared to an opening price of $4.51 per share on September 30, 2022, the day the SEC filed the complaint in connection with the pump-and-dump scheme.

133.   The decline in the value of the Company's common stock has harmed Loop's ability to finance the Company's operations and develop its business plan through equity financing. In addition, Loop was harmed by the substantial compensation and benefits paid to the Individual Defendants, who breached their fiduciary duties to the Company.

134.   As a direct and proximate result of the Individual Defendants' misconduct and breach of fiduciary duties, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a liar's discount regarding Loop's stock in the future.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

135.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

136.   Loop is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

137.   Plaintiff is a current shareholder of Loop and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

138.   Defendant Danks, along with Stephens, Destler and Lazerus, engaged in a scheme artificially inflate the price of the Company's common stock and sell their shares during the Relevant Period, without disclosing that they were the owners of the stock, in violation of Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act.

139.   At the time this action was commenced, the six-member Board was comprised of Defendants Solomita, Sellyn, Stubina, Sams, Lapham, and Lee. Accordingly, Plaintiff is only required to show that three Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all six of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

140.   The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the issuance of various false and misleading statements, authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, and are

principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

141.    The Individual Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Individual Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

142.    As members of the Board charged with overseeing the Company's affairs, each of the Individual Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Loop, the Individual Defendants knew, or should have known, the material facts surrounding the ownership and control of the Company and its stock.

143.    Moreover, the Individual Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence.

144.    Defendants Sellyn, Stubina, Lapham, and Sams are not disinterested or independent, and therefore, are incapable of considering a demand because they serve or have served as members of the Audit Committee during the Relevant Period and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, inter alia, public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the ownership and control of the Company and its stock. Therefore, Defendants Sellyn, Stubina, Lapham, and Sams cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would

expose them to substantial liability and threaten their livelihood.

145.   The Individual Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Individual Defendants to also adhere to Loop's standards of business conduct. The Individual Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Individual Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

146.   Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

147.   The Individual Defendants derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the directors from adequately monitoring the Company's operations and internal controls and calling into question the other Individual Defendants' conduct.  Thus, any demand on the current Board would be futile.

148.   The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Loop. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Loop, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

149.   If there is no directors' and officers' liability insurance, then the directors will not cause Loop to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

150.   Thus, for all of the reasons set forth above, all of the directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### COUNT I
### Against the Individual Defendants for Violations of § 10(b)
### of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5

151.   Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

152.   The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

153.   The Individual Defendants, individual and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

154.   The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

155.   The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of Loop were materially false and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

156.   The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Loop, their control over, and/or receipt and/or modification of Loop's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Loop, participated in the fraudulent scheme alleged herein.

157.   As a result of the foregoing, the market price of Loop common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of Loop common stock in purchasing Loop common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

158.   In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including reputational harm.

### <u>COUNT II</u>

**Against the Individual Defendants for Breach of Fiduciary Duty**

159.   Plaintiff incorporates by reference and realleges the preceding allegations as if fully set forth herein.

160.   The Individual Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

161.   The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

162.   The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise

failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

163.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

164.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, damage to the share price of the Company's stock, resulting in an increased cost of capital, and significant reputational harm.

## COUNT III

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

165.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

166.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties.  In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

167.    Plaintiff on behalf of Loop has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

168.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

169.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Loop.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

170.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Loop that were tied to the performance or artificially inflated valuation of Loop or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

171.   Further, Defendants Danks and Solomita benefitted financially directly from the fraudulent and illegal pump-and-dump scheme alleged herein.

172.   Plaintiff, as a shareholder and a representative of Loop, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

173.   Plaintiff on behalf of Loop has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Gross Mismanagement

174.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

175.   The Individual Defendants, either directly or through aiding and abetting, failed to reasonably exercise their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the expectations and operations of a publicly held corporation.

176.   As a direct and proximate result of the Individual Defendants' gross mismanagement alleged herein, the Company has sustained and will continue to sustain substantial damages.

177.   Plaintiff on behalf of the Company has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Awarding punitive damages;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: August 16, 2023                          **ALDRICH LAW FIRM, LTD.**

By:   */s/ John P. Aldrich*

**OF COUNSEL:**                                      John P. Aldrich (6877)
                                                    Catherine Hernandez (8410)
**RIGRODSKY LAW, P.A.**                             7866 West Sahara Avenue
Seth D. Rigrodsky                                   Las Vegas, NV 89117
Timothy J. MacFall                                  jaldrich@johnaldrichlawfirm.com
Gina M. Serra                                       chernandez@johnaldrichlawfirm.com
Vincent A. Licata
825 East Gate Boulevard, Suite 300
Garden City, NY 11530                               *Attorneys for Plaintiff*
Telephone: (516) 683-3516
Email: sdr@rl-legal.com
Email: tjm@rl-legal.com
Email: gms@rl-legal.com
Email: vl@rl-legal.com
*Pro Hac Vice Applications to be submitted*

**ROSCA SCARLATO LLC**
Alan L. Rosca
2000 Auburn Drive, Suite 200
Beachwood, OH 44122
Paul J. Scarlato
161 Washington Street, Suite 1025
Conshohocken, PA 19428
Telephone: 216-946-7070
Email: arosca@rscounsel.law
Email: pscarlato@rscounsel.law
*Pro Hac Vice Applications to be submitted*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

_____

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT